UNITED STATES of America,
Plaintiff–Appellee,

v.

Ray Lewis BOWMAN, a.k.a. Charles
Clark, Defendant–Appellant.

No. 99–30120.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 1, 2000

Filed June 12, 2000

Peter Camiel, Mair, Camiel & Kovach, Seattle, Washington, for the defendant-appellant.

Katrina C. Pflaumer, United States Attorney, and Arlen Storm, Assistant United States Attorney, Tacoma, Washington, for the plaintiff-appellee.

Before: LEAVY, RYMER, and T. G. NELSON, Circuit Judges.

RYMER, Circuit Judge:

One of the most successful partnerships in the nation's history began more than a quarter of a century ago in Kansas City, Missouri and ended in 1997 with the arrests of Ray Lewis Bowman and William Arthur Kirkpatrick. They were known as the "Trench Coat Robbers." Their last hit, at Seafirst Bank in Lakewood, Washington, netted a record $4.4 million.

Both expert locksmiths, they would enter banks just before or just after business hours through locked doors. Wearing wigs, fake mustaches and beards, fedoras, baseball caps, tams, or fisherman's caps, and glasses or sunglasses, one of the two would tie-up bank employees with plastic electrical ties while the other would stand guard with a handgun. Bowman usually used whitish makeup and had an "L" shaped wire with a key on it around his wrist; Kirkpatrick usually had a police scanner piece in his ear. Kirkpatrick would case targets (sometimes with the help of his girlfriend, Myra Penney), arrange for rooms in the vicinity (in the case of Lakewood, under the alias "Don Wil-

son"), and pay the bills. Both Bowman and Kirkpatrick would be gone from home for weeks at a time. After a robbery they would split the take and head their separate ways, Bowman to Kansas City and Kirkpatrick to Burnsville, Minnesota. On his way home, Bowman would stop in different cities along the way, leaving stolen cash, guns and paraphernalia in safe deposit boxes or storage facilities.

Cheryl Clark met both Bowman and Kirkpatrick in the early 1970s, but started dating Bowman in 1983 and moved in with him a year later. Despite being unemployed, he spent money extravagantly on limousines, $800 dinners, expensive cologne, hand made silk shirts, and silk dresses for Clark. He used pay phones, a post office box, and gave money to Clark to deposit into her account. Once when Kirkpatrick got in trouble, Bowman told Clark that he had to help out Kirkpatrick's then wife, because "you take care of your partner's family." Clark saw Bowman experiment with fake mustaches and a wig; and once, when she could see into a room that Bowman always kept locked, she saw police scanners and clothing she had never seen Bowman wear. After Clark and Bowman broke up in late 1989, he dated Jenny Delamotte and they started living together in September 1990. The lifestyle continued. He refused to tell Delamotte anything about his employment, but supported her, her child from a previous relationship, and their two children. He maintained a locked room, which Delamotte was not allowed to enter. And he continued to leave town with no advance notice or advice about where he was going or how to contact him.

Meanwhile Kirkpatrick lived with Penney from 1990 until 1997, primarily in the Minneapolis area. Unlike Bowman, Kirkpatrick told Penney he robbed banks for a living, and she helped by making phone calls, laundering the proceeds, and paying the bills. Kirkpatrick explained that he rented, and she therefore was to pay for, two rooms because "Ray snored." He

rented two rooms in Fife, Washington before the Seafirst robbery using the alias of "Don Wilson," gave the bills to Penney, and she paid them.

Things started to unravel for Bowman when he failed to pay rent on a storage locker. On May 22, 1997 the manager at Federal Van and Storage in Kansas City opened two of Bowman's footlockers in order to sell the contents. They included silencer parts, a bulletproof vest, a baseball cap with "Police" on it, a police scanner with attached ear piece, books on disguises, and videos about picking locks. The manager called the Bureau of Alcohol, Tobacco and Firearms (ATF), which sent an agent to examine the contents. The manager later identified Bowman as "Charles Clark," the name used by the renter, from a photo montage.

About the same time Michael Senty, to whom Penney had paid $180,000 in cash to build a log cabin on the shores of Lake Superior, near Hovland, Minnesota, reported the suspicious cash transaction to the Internal Revenue Service (IRS). The IRS began a money laundering investigation and served Penney at the cabin with a federal grand jury subpoena. Kirkpatrick called Bowman, who wasn't home, but Kirkpatrick told Penney that he would call every Friday at 4:45 p.m., and if Bowman were not there, would call back at 6:00 p.m., repeating the procedure the next day. Kirkpatrick packed up a number of items, left $350,000 with a friend, and headed for a storage unit in Las Vegas. When Bowman finally called, Penney told him pursuant to Kirkpatrick's instructions that "Uncle Tom had been to the house."

Around mid-October 1997, Bowman delivered two briefcases containing $480,000 to his brother, Dan Bowman, from whom he had been estranged since 1985. He told him that it was not "drug money," and to give the briefcases to Bowman's daughters if anything happened to him. Dan Bowman subsequently turned the money over to the FBI. It had bills marked with Seafirst Bank's Washington State ABA

number, "19–2," and the routing number specifically assigned to the Lakewood Seafirst Bank, "84087." In addition, there was a single strap from one of the bundles that was stamped with Seafirst Bank's Washington ABA number and the Lakewood branch routing number, along with a Seafirst teller's number, "122," initialed and dated by her the day of the robbery, February 10, 1997.

Kirkpatrick was arrested returning from Las Vegas on November 10, 1997. In the car there was a note with the numbers "11070" and "64119," Ray Bowman's P.O. Box number and zip code; $1,808,776 in cash; numerous credit cards in the name of "Donald Wilson"; two police scanners with ear pieces; a "10 code" sheet listing police radio codes; plastic electrical ties; and four fake moustaches. After trying to bail Kirkpatrick out with $100,000 in cash, Penney was arrested on November 14 for money laundering. She subsequently pled guilty to an Information charging her with laundering the proceeds of Kirkpatrick's bank robberies. A December 2 search of their cabin turned up photographs of Bowman's children on the refrigerator.

During November, Delamotte noticed that Bowman's disposition changed and when asked why he was so upset, Bowman told her that "something happened to a friend of his and he didn't know if it was going to affect him or not." On December 19 the FBI executed a search warrant at Bowman's residence and found notes placing Bowman in Fife, Washington just prior to the robbery of Seafirst Bank; $89,000 in the basement safe; a "10 code" list of police radio codes; makeup, wigs, beards and mustaches with spirit gum to attach them; plastic electrical ties; police scanners with ear pieces; a bulletproof T-shirt and vest; locksmith manuals and a key code, key blanks, a key making machine, and lock picking equipment. He was arrested for possession of an unregistered

silencer (found in the trunks stored at Federal Van and Storage in Kansas City), and ultimately was tried and convicted on this offense. On February 11, 1998 the FBI conducted lineups in Seattle; both Bowman and Kirkpatrick refused to speak, or to produce handwriting or voice exemplars.

On August 5, 1998 a federal grand jury returned a four-count superseding indictment against Bowman for conspiracy to commit bank robbery, armed bank robbery, use and carrying of a firearm, and interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2213(a) and (d), 371, 924(c)(1), and 2314.[1] The armed bank robbery charge (count 2), the use and carrying of a firearm charge (count 3), and the interstate transportation of stolen property charge (count 4), all arose out of the Seafirst robbery. Six different bank robberies (occurring in six different states) were charged as overt acts, although evidence was presented only as to these five:

1. *Hawkeye Bank and Trust Company, Des Moines, Iowa—November 7, 1987 ($48,500)*

At 3:30 a.m. on November 6, 1987, Bowman and Kirkpatrick broke into the Des Moines, Iowa home of a Hawkeye Bank employee. Both men wore trench coats, fedoras, fake mustaches, and wigs; Bowman also wore white makeup and cologne. The employee, his wife, and their child, traveled with Bowman and Kirkpatrick to the bank at gunpoint, where Bowman tied them up with plastic electrical ties. Kirkpatrick was fiddling with something in his ear. The kidnaped employee provided them with one combination to the vault and the assistant manager provided the other when she arrived. Kirkpatrick and Bowman left with $48,500.

At the Seattle lineup, over ten years later, the employee's son identified Bowman; the employee identified someone

---

1. Kirkpatrick was charged in the original indictment, but was released to the District of Minnesota where a grand jury had returned an indictment for money laundering and bank robbery.

other than Bowman; and his wife could not identify anyone. Two other Hawkeye employees who came into work during the robbery identified someone other than Bowman.

### 2. Michigan National Bank, Saginaw, Michigan—May 28, 1992 ($122,386)

Twenty minutes before opening on May 28, 1992, Bowman and Kirkpatrick entered a Saginaw branch of Michigan National through a locked door. Both men wore navy blue windbreakers and blue baseball caps; Bowman again had on white makeup and a fake mustache while Kirkpatrick wore a wrist cord with a key attached to it and had in an ear piece which seemed to be connected to a police scanner. Kirkpatrick tied up the employees with plastic electrical ties while Bowman led a teller into the vault room, where he took $122,386.

Kirkpatrick had rented two rooms at the Lansing, Michigan Holiday Inn from May 10–12, 1992, about two weeks prior to the robbery. On May 29, 1992, the day after the robbery, a safe deposit box attendant at Norwest Bank in Bloomington, Michigan assisted Bowman, whom the attendant recognized, in entering safe deposit box 759 where the FBI later found $11,900; fake mustaches and sideburns; a wig; four handguns; and lock picks. At the Seattle lineup, one of the Michigan National employees did not choose anyone from the Bowman lineup, another chose someone else.

### 3. U.S. Bank, Portland, Oregon—February 16, 1994 ($233,026)

Shortly after 5:00 p.m. on February 16, 1994, Kirkpatrick and Bowman entered the locked doors of a Portland, Oregon branch of U.S. Bank. Bowman wore a trench coat, large glasses, a fake mustache, and a wig while Kirkpatrick wore a mid-thigh length coat, a brimmed hat, and glasses. Bow-

man, who had an "L" shaped piece of wire hanging from his wrist, ordered the manager to tie up the bank employees with plastic electrical ties. In the vault room, Bowman had the manager open two safe deposit boxes and a cash bus, from which Bowman removed $233,026.

Kirkpatrick rented two rooms at the Comfort Inn in Wilsonville, Oregon from January 6, 1994 through February 17, 1994. About a week prior to the robbery, on February 8, 1994, Bowman made a cash payment for a safe deposit box at the Seafirst Bank in Seattle, Washington, where the FBI later found $7,900, a semi-automatic handgun, and a revolver. None of the three U.S. Bank employees to view the Seattle lineup was able to identify Bowman.

### 4. National City Bank, West Carrollton, Ohio—October 6, 1994 ($362,529)

Just after closing on October 6, 1994, Kirkpatrick and Bowman entered the National City Bank in West Carrollton, Ohio wearing tan mid-length coats and fisherman's hats. Bowman also wore a wig and sunglasses; Kirkpatrick wore glasses and carried a police scanner. At gunpoint, Kirkpatrick secured the employees with plastic electrical ties while Bowman had the head teller open three safe deposit boxes used by the bank as a vault. Approximately $362,529 was taken from the boxes.

Kirkpatrick had rented two rooms at the Comfort Inn in Indianapolis, Indiana from October 3–7, 1994. In Clive, Iowa the day after the robbery, Bowman leased a safe deposit box at Brenton Bank[2] where the FBI later found $200,020 in cash and a handgun.

### 5. Seafirst Bank, Lakewood, Washington—February 10, 1997 ($4,461,681)

The last robbery occurred on February 10, 1997. Around 6:30 p.m., after the bank

---

**2.** Bowman leased the box in his name with the Kansas City, Missouri address of P.O. Box 11070.

had closed, Bowman (wearing sunglasses, a trench coat, and a baseball cap) and Kirkpatrick (wearing glasses, a trench coat, and a tam) entered the locked doors of Lakewood's Seafirst Bank. Kirkpatrick had an ear piece that appeared to be connected to a police scanner. Seafirst had received deposits from local businesses earlier that day, which employees were counting, strapping into 100 note bundles, and stamping with the Seafirst insignia. Kirkpatrick led three Seafirst employees to the safe deposit room at gunpoint, told them to face the wall and shut their eyes, and tied them up with plastic electrical ties. After asking the employees about the vault's security system, Bowman went to the vault room and broke open cash buses containing $4,461,681 and weighing 355 pounds, which he and Kirkpatrick carried out of the bank.

All three employees picked Bowman out of the Seattle lineup one year later. The evidence showed that Kirkpatrick had rented two rooms using the alias of "Don Wilson," with an address in Apple Valley, Minnesota, at the Holiday Inn in Fife, Washington from October 7–22, 1996; the Pony Soldier Inn in Kent, Washington from November 17–22, 1996; and the Pony Soldier Inn again from January 26, 1996 through February 10, 1997. Penney testified that she paid the bill for the Holiday Inn and that Kirkpatrick was gone for several weeks beginning in late January 1997; Delamotte testified that Bowman left their Kansas City home for approximately three weeks in late January 1997. A piece of paper with "Pony Soldier Inn" letterhead was found in Bowman's basement, on which he had jotted down information about a November 26, 1996 piano concert at the University of Washington. On the drive back to Kansas City, Bowman opened safe deposit boxes in Murray, Utah; Denver, Colorado; Omaha, Nebraska; Clive, Iowa; and Kansas City, Missouri. The safe deposit boxes were

opened on consecutive days, beginning February 12, 1997; were all rented in Bowman's name; and had the same P.O. Box 11070, Kansas City, Missouri address. In these boxes, the FBI found $1,485,400 in cash (with many of the bills containing the Seafirst stamp), two revolvers, four automatic handguns, gloves, lock picking tools, false mustaches, and spirit gum.

Bowman was convicted on all counts after trial to a jury. He was sentenced to 295 months in custody, and has timely appealed his conviction and sentence. He raises issues about the search of his trash and house, challenges a number of evidentiary rulings, and contends that the district court should not have given him a firearm enhancement under USSG § 2B3.1(b)(2)(C) for two of the robberies when it also sentenced him under 18 U.S.C. § 924(c) for use of a firearm in connection with the Seafirst robbery. The sentencing issue is the only one of first impression. However, we have already held that the application of a § 924(c) enhancement on one count and the guidelines brandishing enhancement on remaining counts does not amount to double counting, *see United States v. Chin–Sung Park,* 167 F.3d 1258 (9th Cir.1999), and now join the Court of Appeals for the First Circuit in holding that Bowman's offense level could properly be increased for brandishing a firearm during robberies other than Seafirst, which is the only robbery for which he was convicted of using a firearm in violation of § 924(c). *See United States v. McCarthy,* 77 F.3d 522, 536–37 (1st Cir. 1996). As none of the other issues requires reversal, we affirm.

## I

Bowman moved in limine to prohibit Penney from testifying about twenty-two statements Kirkpatrick made to her which the government indicated it wished to introduce.[3] The district court ruled that

---

3. The statements were:

• Kirkpatrick was a bank robber and "Ray from Kansas City" was his partner

many of the statements were admissible as against Kirkpatrick's interest, and that others were admissible on this basis as well as a co-conspirator statement. Bowman argues that the district court's decision violated Federal Rules of Evidence 801(d)(2)(E) and 804(b)(3) because the statements were not in furtherance of the conspiracy or against Kirkpatrick's penal interests, and violated his rights under the Sixth Amendment's Confrontation Clause.

■ We review a decision to admit co-conspirator statements for abuse of discre-

- Bowman called Kirkpatrick to say that they were featured on "America's Most Wanted" and "Unsolved Mysteries"
- Kirkpatrick wore stage makeup and would one day show Myra Penney how he looked
- Kirkpatrick would not give Bowman's last name because his identity should stay a secret
- Bowman lived in Kansas City and Kirkpatrick once took him $8,000 to Des Moines to even up the split from one of their robberies
- Bowman's calls were important and Penney was to give Kirkpatrick the phone and then leave the room
- Bowman regularly called from phone booths and Kirkpatrick went out to call him from phone booths
- Kirkpatrick had changed his name to Don Wilson in approximately 1988 or 1989 in order to avoid a felony warrant in his real name
- During a trip to Saginaw, Michigan, Kirkpatrick was surprised a car "was still there"
- At one point, Kirkpatrick ran out of money and told Penney that they had to stop building their house or get more money. Shortly thereafter, Bowman called, Kirkpatrick left, and returned with money to finish the house. Kirkpatrick on a later vacation pointed out a Las Vegas bank which he indicated was the source of the money for the house
- In depositing money in the bank, it was important to separate out any bills with extraneous markings on them which would identify them, and to make deposits in small amounts
- After returning from business trips, Kirkpatrick would give Penney credit card bills and receipts to reconcile, ask her to pay them, indicate there were two rooms because "Ray snored," and would then require the receipts back to be burned

tion, and the factual determination that statements were made in furtherance of a conspiracy for clear error. *See United States v. Gil*, 58 F.3d 1414, 1419 (9th Cir. 1995). Alleged violations of the Confrontation Clause are reviewed de novo. *See United States v. Peterson*, 140 F.3d 819, 821 (9th Cir.1998). Under Rule 801(d)(2)(E), the statement of a co-conspirator is admissible against the defendant if the government shows by a preponderance of the evidence that a conspiracy existed at the time the statement was made; the

- Kirkpatrick had bought tires in Tacoma on a particular trip
- In January 1997, Kirkpatrick got a call from Ray and left shortly thereafter
- In February 1997, Kirkpatrick called Myra Penney and asked her to record the Seattle news from their satellite dish. Thereafter, Kirkpatrick told her that they "went in after closing"
- Kirkpatrick and Bowman were planning one more final robbery and then to retire. Kirkpatrick said the robbery required four guys and Bowman lined one up. Kirkpatrick was uncomfortable about a stranger but said he had to trust Bowman
- Certain code words were to be used if there was trouble
- Kirkpatrick and Bowman had a system for calling each other after service of an IRS subpoena to assure regular contact and that he would be leaving the house to make calls from a phone booth to Bowman at a particular time
- After service of an IRS subpoena on Penney, Kirkpatrick told her that he had taken $450,000 out of their safe deposit boxes and was taking it to safe keeping in Las Vegas
- The storage locker in Las Vegas had lots of "incriminating evidence in it" and that two others had access to the locker, Bowman and Midnight Dolan
- Kirkpatrick went into a post office in Seaside, Oregon, he told Penney he was sending Ray a key to that storage locker but not one to Midnight Dolan because they had had a falling out
- Kirkpatrick told Penney he was worried about the security of the Las Vegas locker because Bowman and he had had one in Des Moines and had lost stuff in a burglary because of it. Kirkpatrick had therefore decided to retrieve the goods from his Las Vegas storage locker

defendant had knowledge of, and participated in, the conspiracy; and the statement was made in furtherance of the conspiracy. *See Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Narrations of past events are inadmissible, but expressions of future intent or statements that "further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy" are admissible under Rule 801(d)(2)(E). *United States v. Yarbrough,* 852 F.2d 1522, 1535 (9th Cir. 1988) (citation omitted).

■ There is no question that Penney was part of the conspiracy. She helped Kirkpatrick deposit proceeds by putting them in various bank accounts in her name, she cased a bank with Kirkpatrick, she paid the credit card bills that contained expenses for Bowman and Kirkpatrick, and at Kirkpatrick's request she warned Bowman about the IRS subpoena. Almost all of Kirkpatrick's statements were made to keep Penney informed about what was going on, and to enlist her help in conducting and covering up the operation. Although he broadly faults the court for admitting the statements in general, Bowman specifically points to Kirkpatrick's statements that he was a bank robber and that Ray from Kansas City was his partner. He submits that these statements were merely conversation that did not further the conspiracy, and were in the nature of admissions of culpability to someone Kirkpatrick had individually decided to trust. *See United States v. Moore,* 522 F.2d 1068, 1077 (9th Cir.1975) (statement to a tool dealer at swap meet known to co-conspirator was nothing more than casual admission of culpability to someone he had individually decided to trust). However, Penney had to know Kirkpatrick was a bank robber in order to help him. These (and other similar) statements made possible Penney's help in paying bills that included rooms rented for Bowman as well as in communicating with him when the chips were down. Bowman

also points to the statement that he called Kirkpatrick and told him to watch Unsolved Mysteries, but this furthered the conspiracy because information about the information known to law enforcement, which often appears on such programs, helped the conspirators monitor the response to the Seafirst robbery and conceal their activities. Likewise, Kirkpatrick's statement that he went to the post office in Seaside, Oregon and sent Ray a key to a storage locker kept Penney up to speed.

■ While Kirkpatrick's statements about the Las Vegas storage locker having incriminating evidence in it is more problematic, it helped explain why Kirkpatrick had gone to Las Vegas after the subpoena had been served and thus may plausibly have been made to keep Penney informed about efforts to conceal the conspiracy. Also, though Bowman does not single it out, Kirkpatrick's statement to Penny that they "went in after closing" at the Seafirst robbery is problematic as it appears to be a narration of past fact not intended to elicit Penney's assistance. However, even if neither statement should have been admitted, the error is harmless. Evidence erroneously admitted in violation of the Confrontation Clause must be shown harmless beyond a reasonable doubt, with courts considering the importance of the evidence, whether the evidence was cumulative, the presence of corroborating evidence, and the overall strength of the prosecution's case. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Here, the evidence linked Bowman to the conspiracy beyond a reasonable doubt. Bowman was identified as one of the Hawkeye robbers; he opened a safe deposit box in Lansing, Michigan the day after the Michigan National bank robbery where the FBI later found almost $12,000 in cash, costumes, guns, and lock picks; he opened a safe deposit box in Clive, Iowa the day after the National City robbery where the FBI later found over $200,000 in cash and a handgun; and he and Kirkpatrick were both identified as

the Seafirst robbers, over a million dollars in cash was found in Bowman's safe deposit boxes with Seafirst stamps, the briefcases he gave to his brother had Seafirst money in them, and a note on Pony Inn stationary in his handwriting was found at his house. This, in addition to other evidence connecting Bowman to Kirkpatrick, including pictures of Bowman's children on Kirkpatrick's refrigerator and notes in Kirkpatrick's car referenced to Bowman's Post Office Box number and zip code, together with Bowman's unexplained wealth and entry into safe deposit boxes located near banks that had just been robbed, renders any error in admitting Penney's testimony about Kirkpatrick's statements harmless.[4]

## II

 Bowman argues that the district court violated his right to present a defense and abused its discretion by excluding evidence of three other bank robberies attributed to the trench coat robbers where other suspects had been identified by eyewitnesses. In particular, Bowman wanted to show that Francis Bolduc and Francis Larkin were convicted of two such robberies, the June 28, 1988 robbery of First Wisconsin Bank, Greenfield, Wisconsin and the October 18, 1989 robbery of First Wisconsin Bank in Milwaukee. While we have recognized that "other crimes" evidence of third party culpability may be introduced under Rule 404(b) if there are distinctive similarities between the crime charged and the other robberies, such evidence may still be excluded if it is insufficiently probative in light of its prejudicial effect under Rule 403. *See, e.g., United States*

*v. Perkins*, 937 F.2d 1397, 1401 (9th Cir. 1991) (recognizing principle but upholding exclusion of "several extraneous robberies"). Here, the district court did not abuse its discretion as the proffered evidence lacked probative value and would have been confusing and diverting. In short, the government had claimed that the First Wisconsin robberies had been committed by the trench coat robbers and had obtained convictions of Bolduc and Larkin after they were identified in a photo montage and in a lineup by employees of the two banks. However, both had been in custody since 1989 and could not, therefore, have committed four of the five robberies alleged as overt acts.[5] Bowman's theory was that all 29 robberies identified in the search warrant affidavit of FBI Special Agent Ronald M. Bone were committed by the same individuals, but he failed to link any evidence having to do with Bolduc and Larkin to robberies for which he was being prosecuted.

In addition to the Wisconsin robberies, Bowman argues on appeal that he should have been allowed to prove that two other suspects (John McMahon and John Capasso) were identified as the robbers in the November 13, 1991 uncharged robbery of Valley Bank, Henderson, Nevada. Assuming the issue is preserved, there is no error for Bowman's only proffer was a list of the 29 robberies.

Nor was exclusion of Bowman's evidence at all critical to his defense. *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), and *Perry v. Rushen*, 713 F.2d 1447 (9th Cir.1983), upon which he relies are

---

4. Given this disposition, we do not address whether any of Kirkpatrick's statements were against his interest or whether this exception to the hearsay rule implicates the Confrontation Clause.

5. Indeed, the government discovered during its investigation of Bowman and Kirkpatrick that, one day after one of the Wisconsin robberies for which Bolduc and Larkin were

convicted, Bowman, following his usual pattern after a robbery, leased and entered a safe deposit box in Michigan which was later found to contain fake mustaches and money. As a result, the government has advised Bolduc and Larkin that they may have been wrongly convicted for crimes actually committed by Bowman and Kirkpatrick.

inapposite as in each the proffer was of a percipient witness whose testimony would have exculpated the defendant if believed.

## III

■■■ Bowman challenges the warrantless search of the two footlockers and his trash, as well as the search warrants issued for his residence and safe deposit boxes.[6] The district court denied Bowman's motions to suppress and upheld the search warrant affidavit under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

### A

■■■ First, Bowman argues that the ATF's search of the footlockers after the agent took possession of them, but without obtaining a warrant, violated his Fourth Amendment rights even though the original search was a private search. It is clear that the agent's search is permissible, and constitutional, to the extent that it mimicked the private search conducted by the manager of Federal Van & Storage. *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In two respects, however, the agent's search differed from the private search: he viewed a film and he tested for fingerprints. The government concedes that viewing the film exceeded the private search,[7] but contends that processing the exterior of videotapes for latent prints was not a search. Viewing the film was harmless error, for its contents were not used against Bowman. The results of fingerprint analysis were used in the search warrant affidavit, but it is not necessary to resolve the government's argument because (as we explain in Part III.E) there was sufficient untainted information to support the probable cause determination.

### B

.■■ On December 2, 1997, Kansas City Detective Gary Wantland conducted a warrantless search through four trash bags located on the curb in front of Bowman's residence and found a mail folder addressed to Bowman at his P.O. Box address and a portion of a booklet entitled "Locksmith Ledger" depicting "Jimmy Tools"—in particular, a "J" shaped tool.

Bowman's claim that this violated the Fourth Amendment lacks merit, as the case he cites to show he has a legitimate expectation of privacy in his garbage, *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), comes out the other way. In *Greenwood* the Supreme Court held that there was no legitimate expectation of privacy in garbage because "bags left on or at the side of a public street are readily accessible to ... members of the public" and garbage is put out "for the express purpose of conveying it to a third party, the trash collector." *Id.* at 40, 108 S.Ct. 1625. Bowman suggests that his trash bags were sealed (although he points to nothing in the record which says so), and submits that this should make a difference, but we fail to see how he has a more legitimate expectation of privacy in sealed garbage left curbside than unsealed garbage left curbside.

### C

■■ Next, Bowman argues that the information in the December 1997 affidavit

---

**6.** The lawfulness of a search is reviewed de novo, while the district court's factual findings are reviewed for clear error. *See United States v. Gooch*, 6 F.3d 673, 676 (9th Cir. 1993). This court reviews a magistrate judge's issuance of a search warrant for clear error. *See United States v. Fulbright*, 105 F.3d 443, 453 (9th Cir.1997). "Significant deference" is given to the magistrate judge's original determination of probable cause. *Id.* Whether probable cause is lacking because of alleged misstatements and omissions in the

supporting affidavit is reviewed de novo. *See United States v. Hernandez*, 80 F.3d 1253, 1260 (9th Cir.1996), *overruled on other grounds*, *United States v. Medina–Chavarin*, 147 F.3d 1161 (9th Cir.1998).

**7.** *See Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (agents violated the Fourth Amendment by viewing film found by a private party).

was too stale to support probable cause because the last of three robberies identified in the application, the Seafirst robbery, occurred ten months before. He also points out that Cheryl Clark had not seen Bowman since 1993, and that the last known contact between Bowman and Kirkpatrick was in 1988.

■ "[A] search warrant is not stale where there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Nance,* 962 F.2d 860, 864 (9th Cir.1992) (internal quotations and citations omitted). Here, the application sought permission to seize instrumentalities of a career of bank robberies; and it includes information that Kirkpatrick possessed more than $1.8 million taken during the Seafirst robbery just one month before, that Bowman's storage locker contained a considerable variety of bank robbery paraphernalia as recently as May, and that Penney told the government that Bowman and Kirkpatrick planned to execute one last $12 million robbery which was corroborated by Kirkpatrick's November 1997 removal of bank robbery tools from his Las Vegas storage locker. In light of these recitations there was ample basis for the magistrate judge to infer that the items to be seized would still be on the premises.

### D

■ Bowman maintains that Agent Bone made material omissions that invalidate the warrant.[8] First, he claims that Bone should have included information that after the November 13, 1991, Henderson, Nevada robbery, one of the three robberies described in the affidavit, two suspects (John McMahon and John Capasso) were identified. The district court found no intentional recklessness following an evidentiary hearing at which Agent Bone explained that he had talked with Las Vegas FBI agents about the 1991 Valley Bank robbery but that no one had ever mentioned McMahon and Capasso. Although Bowman concedes that Bone did not know that McMahon and Capasso had been identified, he argues that it was recklessly misleading not to inform the magistrate judge about them. We are not firmly convinced that it was, as the evidence showed that the Las Vegas FBI had already ruled out the two identified suspects by the time Bone called about the Valley Bank robbery.

Bowman makes a similar claim regarding the Wisconsin robberies. Bone informed the magistrate judge about a conspiracy to rob banks from 1983 to Kirkpatrick's arrest in November 1997, during the course of which as many as 29 bank robberies were committed. The affidavit explained that because they share a common modus operandi, the FBI refers to these 29 bank robberies collectively as the "Trench Coat Robberies," and states that

> Two of the 29 robberies that fit the modus operandi of the Trench Coat Robberies have been closed due to a successful prosecution of two other defendants. The defendants in that case maintain their innocence.

Bowman faults Bone for failing to indicate that the convictions were based on eyewitness identifications, but does not suggest any basis on which the district court clearly erred in finding no intentional or reckless conduct. Regardless, it is inconceivable that adding this information to what the magistrate judge already knew would defeat the probable cause determination.

### E

■ Bowman argues that the affidavit in support of searching his home and safe

---

8. A warrant is invalid, or a *Franks* violation occurs, if the defendant establishes by a preponderance of the evidence that the affiant intentionally or recklessly omitted information and the inclusion of the information would defeat a finding of probable cause. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. DeLeon,* 979 F.2d 761, 763 (9th Cir.1992).

deposit boxes fails to establish that he committed a crime because it lacks any reference to eyewitness identification, forensic evidence connecting him to any of the robberies, and evidence that he was in any of the cities where the robberies occurred on the date of the robberies. We disagree. The affidavit establishes that Kirkpatrick was one of the "Trench Coat Robbers"; that Bowman and Kirkpatrick were arrested together by Kansas City Police in 1974 for grand theft and had been seen together in Bowman's Corvette in 1988; that between 1983 and 1997 each referred to the other as his "partner," including Kirkpatrick's identifying "Ray from Kansas City" as his bank robbery partner to Penney; that pictures of Bowman's children were on Kirkpatrick's refrigerator; that Bowman fits the description witnesses gave of the shorter robber; that Bowman had makeup, wigs and guns, asked Clark to buy firearms for him in her name, and his garbage contained a page torn from "Locksmith Ledger" depicting a "J" shaped tool that resembles the device recovered from the scene of one of the three robberies; that he had rented storage lockers and filled them with bank robbery supplies; that he and Kirkpatrick shared a locker in Las Vegas; and that Kirkpatrick mailed a key in Seaside, Oregon for the new lock on the Las Vegas storage unit to "Ray" and that Bowman received a package postmarked and dated September 12, 1997 from Seaside. In addition, the affidavit shows that Bowman's lifestyle was consistent with execution of the crimes alleged: he traveled for two weeks at a time; told Clark that he traveled because "you never shit in your own mess kit"; and when he left town, took disguises and guns with him. The affidavit also establishes that Bowman had not filed an income tax return for ten years, did not appear to work, and spent substantial sums freely.

Bowman implies that Penney (who was the source for much of this information) was not reliable because she was Kirkpatrick's girlfriend who had been charged with money laundering and was cooperating with the authorities. The district court thought otherwise and its view is well supported given that Penney's statements were detailed, corroborated, and self-incriminatory.

■ In sum, the affidavit sets forth facts sufficient to amount to probable cause that Bowman possessed evidence of a bank robbery conspiracy and income tax evasion. Even if not, Bowman does not dispute the district court's finding that the agents relied on the warrants in good faith. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Thus, the evidence seized pursuant to the warrants was admissible.

IV

■ Bowman maintains that the district court erred in allowing identification testimony from witnesses who viewed a lineup that was tainted because witnesses viewed the suspects together instead of separately, which he claims is a "disapproved" procedure under *United States v. Bagley,* 772 F.2d 482 (9th Cir.1985); knew that suspects were in custody and they should make a pick; and had not been interviewed before the lineup to gauge their memory of the robbers.[9] The lineup, which took place on February 11, 1998 in Seattle, included Bowman and five similar looking men in identical clothing. Twenty-six witnesses viewed the lineup. FBI Agent Alfred Gunn remained in the lineup room to watch the witnesses. They were instructed not to talk to one another, not to let anyone see their choices, and not to make comments or gestures as they viewed the lineups. They were also given a written form with additional instructions about keeping the responses private. Gunn testified that the witnesses did not

9. This court reviews de novo whether a pretrial lineup was impermissibly suggestive.

*See United States v. Montgomery,* 150 F.3d 983, 992 (9th Cir.1998).

talk to each other during the lineup. Only four of the witnesses identified Bowman.

Viewing the totality of the circumstances, we cannot say that the procedure created a "very substantial likelihood of irreparable misidentification." *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir.1985). First, the joint identification procedure disapproved in *Bagley* was quite different from that employed here, for in that case a photographic display was seen by two witnesses at the same time and the second one to comment heard the first one's selection before he was called upon to make his. The evil of impermissible influence that exists when a witness knows what others have done does not exist in the format followed in the Seattle lineup. In the absence of any evidence that there was any serial communication among the witnesses, there is no due process violation. Second, Bowman's fear that the lineups were impermissibly suggestive because witnesses knew that the suspects were in custody is misplaced. The witnesses were told that they need not make an identification if they were not confident. In fact, many did not. Moreover, it stands to reason that there *is* a suspect at the lineup stage. Bowman does not suggest how this increases the suggestibility of the procedure. Finally, the witnesses' perceptions were already noted in police reports and Bowman's counsel was able to cross-examine about any deficiencies at the lineup or in their perceptions.

## V

Bowman argues that the district court improperly admitted thirteen firearms and seven photographs of the same guns because the government could not directly link them to the any of the robberies charged as overt acts. Of the 140 firearms found in Bowman's lockers and residence, the district court admitted only the thirteen handguns found in the six out-of-state safe deposit boxes opened either immediately before or after four of the bank robberies. The district court

held that the prejudicial effect of admitting the evidence did not substantially outweigh its probative value.

Bowman claims that the guns were irrelevant under Rule 401 and 402, and unfairly prejudicial under Rule 403. However, victims of each of the five robberies presented at trial stated that the shorter perpetrator (Bowman) carried a handgun, albeit a different one during different robberies. The guns that were admitted were found in boxes which Bowman had entered between November 1987 and November 1997. The boxes in which the thirteen guns were found also had wigs, lock picks, and more than $1 million in cash. As such, the guns are direct evidence of the conspiracy and were therefore properly admissible under Rule 401. Nor was their probative value substantially outweighed by the risk of undue prejudice; Bowman defended his possession of half of the Seafirst cash on the footing that he was merely laundering money for Kirkpatrick, but his possession of tools of the robbery trade, including the handguns, shows otherwise. Further, Bowman's possession of these handguns was material to count 3, charging use and carrying of a firearm in connection with the Seafirst robbery. *See, e.g., United States v. Walters*, 477 F.2d 386, 388 (9th Cir.1973) (finding no error in admitting a gun that the government had not linked to the one used during the robbery because it was related to an element of the crime).

Bowman's reliance upon *United States v. Tai*, 994 F.2d 1204 (7th Cir.1993), is misplaced. *Tai* was an extortion case in which the government showed two guns to the jury that were found in the defendant's pawn shop two weeks after his arrest. They were not located with criminal proceeds or instrumentalities, nor were they linked in any way to the plot. As such, the only purpose was to show that Tai, who had two guns, must have a propensity to commit crimes, clearly a violation of Rule 404(b). Here, the guns were found with proceeds and instrumentalities, and were

linked to the conspiracy, if not to a specific robbery. They were, accordingly, admitted for a relevant purpose.

## VI

■ After a break during trial, a deputy United States Marshal wearing a sports jacket and tie walked through a door into the courtroom with Bowman behind him. Bowman was not handcuffed or otherwise restrained. When the deputy saw that the jury was also walking into the courtroom, he turned around and exited. There is no indication that any of the jurors actually saw Bowman. In any event, defense counsel asked the court to inquire of the jury "whether they have seen or observed anything in the courtroom or outside the courtroom which caused them to form any opinions about Mr. Bowman," and only if there were an affirmative response to give a cautionary instruction or declare a mistrial. The court did as requested, and the jurors indicated that they had not seen anything of concern. No mistrial was requested. Bowman argues that he was denied a fair trial because the district court nevertheless did not grant one. We disagree. Assuming the issue is preserved, there was no error and Bowman has not and cannot show prejudice. *See United States v. Halliburton,* 870 F.2d 557 (9th Cir.1989).

## VII

■ Bowman argues that the district court clearly erred in finding beyond a reasonable doubt that he committed the U.S. Bank and National City robberies for purposes of USSG § 1B1.2(d).[10] When, as here, the verdict does not establish which overt acts were committed, § 1B1.2(d) may only be applied if the court, sitting as trier of fact, would have convicted the defendant of conspiring to commit the overt act. USSG § 1B1.2(d), Comment 5. The court

sentenced Bowman for the robbery of Seafirst Bank charged in count two, and the robberies of U.S. Bank, Portland, Oregon, and National City Bank, West Carrollton, Ohio, which were alleged as overt acts of the conspiracy charged in count one. Bowman contends that there was no evidence placing him inside either bank or in either city at the time of the robberies.

The district court found the existence of Bowman's guilt of the U.S. Bank and National City robberies to be beyond a reasonable doubt without "a problem," noting a "consistency" between all of the robberies. This finding was not clearly erroneous. Like the Seafirst robbery, for which the jury expressly found Bowman guilty, witnesses gave descriptions of taller and shorter robbers matching Kirkpatrick and Bowman, of robbers wearing trench coats and glasses, who entered the bank after hours without force and used plastic electrical ties to secure the employees. Bowman opened up a safe deposit box around the same time and near both crimes (one in Seattle, Washington; the other in Clive, Iowa), which were later found to possess three guns, disguises, lock picks, and over $200,000 in cash. Finally, Kirkpatrick rented two hotel rooms near both banks at the same time as the robberies.

## VIII

■ The district court applied a five-level upward enhancement pursuant to USSG § 2B3.1(b)(2)(C) for brandishing a firearm in the U.S. Bank and National City robberies, which were overt acts of the conspiracy charged in count one, that Bowman contends was incorrect given his five-year sentence on the § 924(c) count (count four) for use of a firearm in the Seafirst robbery pursuant to USSG § 2K2.4. As Bowman sees it, because the Seafirst robbery was part of the underlying conspiracy offense, and because Bow-

---

**10.** USSG § 1B1.2(d) provides that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on

a separate count of conspiracy for each offense that the defendant conspired to commit."

man was sentenced under § 2K2.4 for use of a firearm in the Seafirst robbery, also applying the brandishing enhancement to the other two overt acts constituted impermissible double-counting.[11]

We essentially resolved this question in *United States v. Chin–Sung Park*, 167 F.3d 1258 (9th Cir.1999). There, the defendant was convicted of three bank robberies, on one of which he was also charged with a § 924(c) count. We held that imposing sentence on the § 924(c) count, which is a mandatory minimum 60–month sentence, and applying the guidelines brandishing enhancement on the remaining counts did not amount to double counting. The reason is that "Park is being punished only once for brandishing a firearm in each robbery —via sentencing enhancements for the October and December robberies, and via a § 924(c) firearm sentence for the November robbery." *Id.* at 1261. The same is true here. Each of the robberies that Bowman conspired to commit and for which he was sentenced is scored separately. USSG §§ 1B1.2(d), 3D1.1(a). His conviction for using a firearm during the Seafirst robbery was in violation of § 924(c) but was not enhanced for brandishing a firearm. His conviction for conspiring to rob U.S. Bank and National City Bank was enhanced for brandishing a firearm but was not subject to the mandatory minimum for violation of § 924(c). Thus, he was not punished twice for the same conduct unless Bowman is correct that the U.S. Bank and National City Bank robberies cannot be separated from the Seafirst robbery.

Bowman points to Application Note 2 to § 2K2.4, which states that where a

§ 924(c) sentence is imposed "in conjunction with the sentence for an underlying offense, any specific offense characteristic for the ... use ... of ... a firearm ... is not to be applied in respect to the guideline for the underlying offense." USSG § 2K2.4, Comment 2. However, as the Court of Appeals for the First Circuit observed in similar circumstances, § 1B1.2(d) "clearly instructs the sentencing court to treat a count charging a conspiracy to commit multiple offenses as separate counts of conspiracy for each offense the defendant conspired to commit." *United States v. McCarthy*, 77 F.3d 522, 536–37 (1st Cir.1996). It concluded that no double counting occurs when there is a § 924(c) count on which the mandatory minimum sentence is imposed, and a brandishing enhancement is applied only when calculating the offense levels relating to non-§ 924(c) count robberies, and we agree.

## IX

Bowman finally contends that the district court erroneously gave a *Pinkerton* [12] instruction on co-conspirator liability in connection with the Seafirst robbery which was not warranted by the evidence because the government's theory was that he was directly involved in the Seafirst robbery, and which incorrectly omitted "reasonably foreseeable" language.[13] He submits that this enabled the jury to convict even if they found that he was not involved in the Seafirst robbery and could not foresee that Kirkpatrick would commit it. The instruction on count 2 (Seafirst robbery) was based upon Ninth Circuit Model Jury Instruction 8.05E.[14]

---

11. We review the district court's interpretation of the Sentencing Guidelines de novo. *See United States v. Smith*, 175 F.3d 1147, 1148 (9th Cir.1999).

12. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

13. A district court's formulation of jury instructions is reviewed for an abuse of discretion. *See United States v. Service Deli Inc.*,

151 F.3d 938, 942 (9th Cir.1998). When there is no objection to the jury instruction at the time of trial, this court reviews for plain error. *See United States v. Garcia–Guizar*, 160 F.3d 511, 522–23 (9th Cir.1998).

14. The instruction provided:

Each member of a conspiracy is responsible for the actions of other members performed during the course and in furtherance of the conspiracy. If one member of a conspiracy

There was no abuse of discretion. Although the government argued that Bowman directly participated in the Seafirst robbery, Bowman argued that he did not. His theory was that he only laundered the money for Kirkpatrick. Thus, the instruction appropriately indicates that Bowman could be liable even if the jury believed that only Kirkpatrick actually committed the Seafirst robbery.

Bowman contends that the failure to include "reasonably foreseeable" language in the *Pinkerton* instruction was exacerbated by the conspiracy instruction, which provided in part:

> Once you have decided that the defendant was a member of a conspiracy, the defendant is responsible for what other conspirators said or did to carry out the conspiracy, whether or not the defendant knew what they said or did.

However, Bowman did not object to any of this, or to the court's failure to include "reasonably foreseeable" language in the *Pinkerton* instruction, so our review is for plain error. We see none. Unlike *United States v. Morfin,* 151 F.3d 1149 (9th Cir. 1998), where we held that it was error (albeit not plain error) to instruct that if the jury convicted on the conspiracy count, the defendant was guilty on the substantive charge as well, the jury here was separately instructed on the conspiracy count (count one) and the Seafirst robbery (count two). There was no possibility of convicting on a theory of vicarious liability. *See United States v. Montgomery,* 150 F.3d 983, 997 (9th Cir.1998). But, even if there were plain error, we cannot say that it affected Bowman's substantial rights as robberies, including the wildly successful Seafirst robbery, were clearly a reasonably foreseeable part of a conspiracy to commit robberies.

AFFIRMED.

commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed the crime. Therefore, you may find the defendant guilty of bank robbery as charged in Count 2 of the Indictment if the Government has proved each of the following elements beyond a reasonable doubt: First, a person committed the bank robbery charged in Count 2 of the Indictment; Second, the person was a member of the conspiracy charged in Count 1 of the indictment; Third, the person committed the bank robbery in furtherance of the conspiracy; Fourth, the defendant was a member of the same conspiracy at the time the offense charged in Count 2 was committed.